POMERANTZ LLP
Brian Calandra
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
bcalandra@pomlaw.com

*Attorney for Plaintiff*

- additional counsel on signature page -

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| RAYMOND MASAITIS, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>                    v.<br><br>COREWEAVE, INC., MICHAEL INTRATOR, NITIN AGRAWAL, and BRANNIN MCBEE,<br><br>                              Defendants. | **Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Raymond Masaitis ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through

Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding CoreWeave, Inc. ("CoreWeave" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired CoreWeave securities between March 28, 2025 and December 15, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      CoreWeave purports to be an artificial intelligence ("AI") cloud computing company and self-described "Hyperscaler", which its Prospectus (defined below) defined as "***a cloud provider or technology company that is capable***

*of delivering computing infrastructure and services at massive scale, typically through large data centers* and geographically distributed networks."[1]

3.     CoreWeave purports to generate substantially all of its revenue from committed long-term contracts providing customers with access to its AI infrastructure and proprietary managed software and application services through CoreWeave Cloud Platform (the "Cloud Platform").

4.     CoreWeave recognizes revenue from such contracts only once it completes installation of the infrastructure necessary to provide its customers with access to the Cloud Platform, including the data centers that house the hardware on which its proprietary software runs.  Such data centers are also known as "powered shells."  After executing a committed contract and receiving a prepayment from its customer, CoreWeave purchases infrastructure components and installs systems necessary to provide its contracted services.  Only after the necessary system infrastructure installation is complete and a contract goes live does CoreWeave recognize revenue from the contract.

5.     CoreWeave's Cloud Platform is hosted in its distributed network of active purpose-built data centers.  Without these underlying data centers, CoreWeave is unable to sell its services to customers or recognize revenue from committed long-term contracts for its services.

---

[1] All emphases herein added unless otherwise indicated.

6.    On March 10, 2025, less than three weeks before CoreWeave conducted its initial public offering ("IPO"), the Company announced a deal worth up to $11.9 billion to deliver AI infrastructure to Open AI, a leading AI company. This announcement served only to bolster investors' anticipation of CoreWeave's IPO.

7.    On March 28, 2025, CoreWeave conducted its IPO, selling 37.5 million shares of common stock priced at $40.00 per share and raising $1.5 billion.

8.    On March 31, 2025, CoreWeave filed a prospectus on Form 424B4 with the SEC in connection with the IPO (the "Prospectus").

9.    In the months following CoreWeave's IPO, its stock price skyrocketed to prices as high as $183.58 on June 20, 2025, *a 348.95% increase* from the offering price. During this time the Defendants consistently represented to investors that the demand for CoreWeave's services was "robust" and "unprecedented," and made positive revenue forecasts in part due to this demand.

10.    However, constantly looming over CoreWeave was the question of how it could meet this "robust" and "unprecedented" customer demand, given the limitations on the infrastructure underlying its AI services. The data centers necessary to CoreWeave's Cloud Platform are highly specialized and in certain cases, designed to meet a customer's bespoke needs. The limitations referenced

above arise because only a limited number of suppliers provide the components and materials necessary to construct these specialized data centers and their contents.

11.    Nevertheless, CoreWeave consistently issued positive revenue guidance during the Class Period—even raising its guidance on one occasion, as discussed *infra* at ¶ 55)— while steadily assuring investors that it was equipped to capitalize on the high customer demand for its AI services.

12.    On July 7, 2025, CoreWeave announced a definitive agreement to acquire Core Scientific, Inc. ("Core Scientific"), one of the largest owners and operators of digital infrastructure for high performance computing in North America, in an all-stock transaction (the "Core Scientific Acquisition").  In its announcement, the Company quoted CoreWeave's Co-Founder and Chief Executive Officer ("CEO"), Defendant Michael Intrator ("Intrator"), as stating the Core Scientific Acquisition enabled CoreWeave to "significantly enhance operating efficiency and de-risk our future expansion, solidifying our growth trajectory."

13.    Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants had overstated CoreWeave's ability to meet customer demand for its service; (ii) Defendants materially understated the scope and severity of the risk that CoreWeave's reliance on a single third-party data center supplier

presented for CoreWeave's ability to meet customer demand for its services; (iii) the foregoing was reasonably likely to have a material negative impact on the Company's revenue; (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

14.    During market hours on October 30, 2025, Core Scientific announced it had not received enough shareholder votes to approve its merger agreement with CoreWeave and, as a result, terminated the merger agreement.

15.    On this news, CoreWeave's stock price fell $8.87 per share, or 6.33%, to close at $131.06 per share on October 30, 2025.

16.    Then, after market hours on November 10, 2025, CoreWeave issued a press release reporting its financial results for quarter ended September 30, 2025. Also on November 10, 2025, CoreWeave held a conference call concerning its financial results for the quarter ended September 30, 2025 (the "Q3 2025 Earnings Call"). During the Q3 2025 Earnings Call, Defendants announced lowered revenue guidance for 2025, citing "delays related to a third-party data center developer who is behind schedule."

17.    Then, during market hours on November 11, 2025, Defendant Intrator appeared for an interview on CNBC's "Squawk on the Street," hosted by Jim Cramer (the "CNBC Interview"). During the CNBC Interview, after Cramer challenged his initial characterization of the delays at issue, Defendant Intrator conceded that the

delays implicated not just one data center, but a single data center **provider**—*i.e.*, that more than one data center owned by the same provider was potentially affected.

18.    On this news, CoreWeave's stock price fell $17.22 per share, or 16.31%, to close at $88.30 per share on November 11, 2025.

19.    Then, after market hours on December 15, 2025, the *Wall Street Journal* published an article reporting new information concerning the data center provider delays, revealing that the scope and severity of data center delivery issues were greater than Defendants acknowledged during the Q3 2025 Earnings Call and the CNBC Interview.  The article revealed that weather-related delays would push back the completion date of a Denton, Texas data center cluster intended for OpenAI by **several months**, that other data centers would be delayed due to revised design plans, that Core Scientific was CoreWeave's building partner behind the delayed data centers, and that **Core Scientific began flagging these delays nine months before CoreWeave announced lowered revenue guidance in November 2025**.

20.    On this news, CoreWeave's stock price fell $2.85 per share, or 3.39%, to close at $69.50 per share on December 16, 2025.

21.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## **JURISDICTION AND VENUE**

22.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

23.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

24.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). CoreWeave is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

25.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

26.    Plaintiff, as set forth in the attached Certification, acquired CoreWeave securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

27.     Defendant CoreWeave is a Delaware corporation with principal executive offices located at 290 W Mt. Pleasant Avenue, Suite 4100, Livingston, New Jersey, 07039.  CoreWeave's common stock trades in an efficient market on the Nasdaq Market ("NASDAQ") under the ticker symbol "CRWV".

28.     Defendant Intrator is one of CoreWeave's Co-Founders and has served as the Company's CEO at all relevant times.  Defendant Intrator has also served as Chairman of the Company's Board of Directors at all relevant times.

29.     Defendant Nitin Agrawal ("Agrawal") has served as CoreWeave's Chief Financial Officer at all relevant times.

30.     Defendant Brannin McBee ("McBee") is one of CoreWeave's Co-Founders and has served as the Company's Chief Development Officer at all relevant times.

31.     Defendants Intrator, Agrawal, and McBee are referred to herein collectively as the "Individual Defendants".

32.     The Individual Defendants possessed the power and authority to control the contents of CoreWeave's SEC filings, press releases, and other market communications.   The Individual Defendants were provided with copies of CoreWeave's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.   Because of their positions with

CoreWeave, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

33. CoreWeave and the Individual Defendants are collectively referred to herein as "Defendants".

## SUBSTANTIVE ALLEGATIONS

### Background

34. CoreWeave purports to be an AI cloud computing company and self-described "Hyperscaler", which its Prospectus defined as "*a cloud provider or technology company that is capable of delivering computing infrastructure and services at massive scale, typically through large data centers* and geographically distributed networks."

35. CoreWeave purports to generate substantially all of its revenue from committed long-term contracts providing customers with access to its AI infrastructure and proprietary managed software and application services through its Cloud Platform.

36.    CoreWeave recognizes revenue from such contracts only once it completes installation of the infrastructure necessary to provide its customers with access to the Cloud Platform, including data centers that house the hardware on which its proprietary software runs.  After executing a committed contract and receiving a prepayment from its customer, CoreWeave purchases infrastructure components and installs systems necessary to provide its contracted services.  Only once installation is complete and a contract goes live does CoreWeave recognize revenue from the contract.

37.    CoreWeave's Cloud Platform is hosted in its distributed network of active purpose-built data centers.  Without the underlying data centers, CoreWeave is unable to sell its services to customers or recognize revenue from committed long-term contracts for its services.

38.    On March 10, 2025, less than three weeks before CoreWeave conducted its IPO, the Company announced a deal worth up to $11.9 billion to deliver AI infrastructure to Open AI.  This announcement served only to bolster investors' anticipation of CoreWeave's IPO.

39.    In the months following CoreWeave's IPO, its stock price skyrocketed to prices as high as $183.58 on June 20, 2025, *a 348.95% increase* from the offering price.  During this time the Defendants consistently represented to investors that the

demand for CoreWeave's services was "robust" and "unprecedented," and made positive revenue forecasts in part due to this demand.

40.    However, constantly looming over CoreWeave was the question of how it could meet this "robust" and "unprecedented" customer demand, given the limitations on the infrastructure underlying its AI services.   The data centers necessary to CoreWeave's Cloud Platform are highly specialized and in certain cases, designed to meet a customer's bespoke needs.   The limitations referenced above arise because only a limited number of suppliers provide the components and materials necessary to construct these specialized data centers and their contents.

41.    Nevertheless, CoreWeave consistently issued positive revenue guidance during the Class Period—even raising its guidance on one occasion, as discussed *infra* at ¶ 55)— while steadily assuring investors that it was equipped to capitalize on the high customer demand for its AI services.

**Materially False and Misleading Statements Issued During the Class Period**

42.    The Class Period begins on March 28, 2025, when CoreWeave securities began publicly trading on NASDAQ.

43.    On March 31, 2025, CoreWeave filed the Prospectus with the SEC.

44.    The Prospectus stated that CoreWeave is "***the AI Hyperscaler^{TM} driving the AI revolution***."   The Prospectus defined a "Hyperscaler" as "***[a] cloud provider or technology company that is capable of delivering computing***

*infrastructure and services at massive scale, typically through large data centers and geographically distributed networks*."

45.     The Prospectus stated that one of CoreWeave's "competitive strengths," which the Company "believe[s] set us apart from the generalized cloud providers in the industry," was its ability to "deploy[] AI infrastructure at massive scale":

> Competitive Strengths.  ***Our key competitive strengths, which we believe set us apart from the generalized cloud providers in the industry, include***: . . . ***We operate at scale***. We benefit from a network of 32 active purpose-built data centers that together ran more than 250,000 GPUs as of December 31, 2024. ***Our specialization in deploying AI infrastructure at massive scale enables us to serve some of the world's leading providers of AI who require massive deployments, benefit from clear economies of scale, and detect issues and derive insights from across our AI infrastructure sooner than our competitors***.

46.     The Prospectus further stated, in relevant part:

> ***Our ability to abstract away the complexity our customers would face in assembling, managing, and deploying this infrastructure themselves establishes us as a critical partner and leads to long-term, durable relationships that have the potential to expand over time***. As evidence of this, three of our top five committed contract customers by total contract value ("TCV") as of December 31, 2024 signed agreements for additional capacity within 12 months of their respective initial purchase dates. These agreements, measured during each respective 12-month period from the initial date of signing, represent a cumulative increase of approximately $7.8 billion in committed spend and a multiple of approximately 4x on initial contract value. Our deep relationships with customers are a competitive advantage, and our first-to-market track record with highly performant technology gives customers confidence in choosing CoreWeave.

13

47.    Also in the Prospectus, CoreWeave specifically represented that its coordination with third parties allowed it to provide customers with infrastructure that would meet their bespoke needs:

> Our purpose-built technology stack is augmented by our lifecycle management and monitoring software, Mission Control and Observability, and our advanced cluster validation, proactive health checking capabilities, and observability capabilities. Our AI cloud runs in a distributed network of 32 active purpose-built data centers, which are specifically engineered to support high intensity AI workloads with features including enhanced power, liquid cooling, and networking components, reinforcing the robustness of our entire technology stack. ***Our Third-Party Tooling and Solutions further enhance this flexibility by providing a composable architecture that allows customers to customize their solution by integrating additional third-party tools***.

48.    On May 14, 2025, CoreWeave held a conference call to discuss its first financial results as a public company, for the quarter ended March 31, 2025. During this call, among other representations, Defendant Agrawal stated the following concerning CoreWeave's expected revenue during 2025:

> ***For 2025, we expect revenue to be in the range of $4.9 billion to $5.1 billion. We expect adjusted operating income in the range of $800 million to $830 million and CapEx of $20 billion to $23 billion due to increased and accelerated investment in our platform to meet customer demand***. This FY 2025 guidance reflects the OpenAI contract we signed in March, the recent $4 billion expansion with the large AI enterprise, and the impact of Weights and Biases.

49.    In response to a question concerning CoreWeave's quarterly revenue performance, Defendant Intrator made the following representations regarding

Defendants' purported focus on the Company's ability to build out infrastructure necessary to provide contracted products and services to its customers:

> With regards to the revenue beat, ***what you are seeing is a concerted strategic effort by the company to pull in the investment in the infrastructure to be able to build and scale and deliver compute more quickly to the client contracts that we have. And so, we've really made the focus on speed of delivery and quality of delivery to be a primary focus for the company***. And that beat was really attributed to our ability to drive that motion within our build delivery system.

50.    On May 15, 2025, CoreWeave filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2025 (the "Q1 2025 10-Q"). The Q1 2025 10-Q stated, *inter alia*, that the Company's quarterly revenue performance, representing a 420% year-over-year increase, reflected its "ability to rapidly scale our operations":

> Revenue for the three months ended March 31, 2025 increased by $793 million, or 420%, compared to the three months ended March 31, 2024. ***This substantial growth was related to increased demand from both existing and new customer contracts and our ability to rapidly scale our operations, emphasizing the strength of our customer relationships and our ability to meet the evolving needs of the industry***.

51.    On July 7, 2025, CoreWeave announced the Core Scientific Acquisition. In its announcement, the Company quoted Defendant Intrator as stating:

> Verticalizing the ownership of Core Scientific's high-performance data center infrastructure ***enables CoreWeave to significantly enhance operating efficiency and de-risk our future expansion, solidifying our growth trajectory***. Owning this foundational layer of our platform will

enhance our performance and expertise as we continue helping customers unleash AI's full potential.

52.    On August 12, 2025, CoreWeave held a conference call to discuss its financial results for the quarter ended June 30, 2025 (the "Q2 2025 Earnings Call"). During the Q2 2025 Earnings Call, among other representations, Defendant Intrator stated the following concerning CoreWeave "ability to scale state-of-the-art infrastructure":

> Our ability to scale state-of-the-art infrastructure will further be bolstered by the more than $6 billion data center investment we've announced in Lancaster, Pennsylvania as well as a large data center project in Kenilworth, New Jersey, that we are co-developing via a joint venture with Blue AL. These new sites are perfect examples of our broader data center strategy, which allow us to provide a mix of both large-scale training and low-latency inference compute across the country.

53.    Also during the Q2 2025 Earnings Call, Defendant Intrator acknowledged challenges "to get enough infrastructure online for the demand signals that we are seeing":

> [I]n terms of the supply side, at the end of the day, right now, ***it's the powered shells that are the choke point that is causing the struggle to get enough infrastructure online for the demand signals that we are seeing***, not just within our company, it's the massive demand signals that you're seeing across the industry. And at the end of the day, what we are looking at, and I think what you're hearing across the board is that this is a structurally supply-constrained market. It is a market that is really working hard to try and balance and there are fundamental components at the powered shell, at the power in terms of the electrons moving through the grid, at the supply chains that exist within the GPUs, the supply chains that exist within the mid-voltage transformers. There's a lot of different pieces that are constrained. ***But ultimately, the***

16

*piece that is the most significant challenge right now is accessing powered shells that are capable of delivering the scale of infrastructure that our clients are requiring*.

54.     Significantly, despite generally acknowledging these challenges, Defendants did ***not*** announce revised revenue guidance for the year.   Instead, Defendant Agrawal announced "***[f]or the second quarter in a row, we are raising our full year revenue guidance***":

> *For the second quarter in a row, we are raising our full year revenue guidance. For 2025, we now expect revenue in the range of $5.15 billion to $5.35 billion, a $250 million increase from our prior guidance of $4.9 billion to $5.1 billion, driven by continued strong customer demand*. We expect adjusted operating income in the range of $800 million to $830 million, unchanged from our prior guidance as *we remain cost disciplined while rapidly scaling our deployments at an unprecedented rate to end the year with over 900 megawatts of active power*. We expect CapEx in the range of $20 billion to $23 billion, unchanged from our prior guidance in the backdrop of continued strong customer demand. A significant portion of our full year CapEx will fall in Q4 due to the timing of go-live dates of our infrastructure.

55.     During an appearance at Deutsche Bank's 2025 Technology Conference on August 27, 2025, Defendant Agrawal again generally acknowledged the challenges that CoreWeave faced in providing its customers with the infrastructure necessary to provide its contracted services:

> *The demand remains relentless. And we're still in a chronically supply-constrained environment where capacity constraints, especially around powered shell capacity is the biggest constrained driver for our growth. We're still in an environment where demand outstrips supply* . . . .

56.     Once again, despite Defendant Agrawal's general acknowledgement that constraints on powered shell capacity presented a challenge for CoreWeave's growth, the Company conspicuously did ***not*** announce a downward revision to its full-year revenue guidance.

57.     On September 9, 2025, all of the Individual Defendants appeared at the Goldman Sachs Communacopia + Technology Conference 2025.  Speaking to the level of demand Defendants were seeing at the time and CoreWeave's ability to meet that demand, Defendant McBee stated:

> And Mike [Intrator] articulated this earlier, we've been consistent in this messaging of ***there is no ability to solve the demand profile that is in the market with the capacity that's available today, right***? ***And capacity being powered shell data center infrastructure. That problem is continuing to persist and is honestly worsening.*** I would say what we've observed over the past 4 to 6 weeks is yet another inflection in demand.  And that demand is . . . it's [AI models that can execute] inference. . . . And what's interesting is it's not thousands or tens of thousands of GPUs. It's hundreds to millions of GPUs. It's at massive scale and at these volumes that no one ever anticipated before.  ***So what is the demand climate today? I'd say it's as tight as it's ever been. There is no solution in sight to be able to bring enough infrastructure into the market to solve what it needs to continue scaling***."

58.     Once again, despite acknowledging that constraints on infrastructure and powered shell/data center capacity presented for CoreWeave's growth and ability to meet customer demand, the Individual Defendants did ***not*** revise the recently raised full-year revenue guidance they had provided on the Q2 2025 Earnings Call.  By maintaining CoreWeave's revenue guidance, Defendants

impliedly assured the market that the company's infrastructure access was sufficient enough to meet enough demand to achieve those figures.

59.    The statements referenced in ¶¶ 44–55, 57 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants had overstated CoreWeave's ability to meet customer demand for its service; (ii) Defendants materially understated the scope and severity of the risk that CoreWeave's reliance on a single third-party data center supplier presented for CoreWeave's ability to meet customer demand for its services; (iii) the foregoing was reasonably likely to have a material negative impact on the Company's revenue; (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

60.    During market hours on October 30, 2025, Core Scientific announced it had not received enough shareholder votes to approve its merger agreement with CoreWeave and, as a result, terminated the merger agreement.

61.    On this news, CoreWeave's stock price fell $8.87 per share, or 6.33%, to close at $131.06 per share on October 30, 2025.

62.     Notwithstanding the foregoing disclosures and resulting drop in CoreWeave's share price, CoreWeave's stock continued to trade at artificially inflated prices due to Defendants' continued false and misleading statements about the scope and severity of the risk that CoreWeave's reliance on a single third-party data center supplier presented for CoreWeave's ability to meet customer demand for its services.

63.     Also on October 30, 2025, CoreWeave issued a press release concerning the Core Scientific shareholder vote.  Among other representations, this press release quoted Defendant Intrator as stating:

> We respect the views of Core Scientific stockholders and look forward to continuing our commercial partnership.  ***CoreWeave's strategy remains unchanged***. We will continue to execute with discipline against our roadmap to create long-term shareholder value, including through opportunistic and strategic M&A.

64.     Despite acknowledging that CoreWeave's acquisition of Core Scientific would not move forward, Defendants did not announce revised revenue guidance for the year, misleadingly overstating CoreWeave's ability to meet customer demand for its service and understating the scope and severity of the risk that CoreWeave's reliance on a single third-party data center supplier presented for CoreWeave's ability to meet customer demand for its services.

65.     The statements referenced in ¶ 63 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to

disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants had overstated CoreWeave's ability to meet customer demand for its service; (ii) Defendants materially understated the scope and severity of the risk that CoreWeave's reliance on a single third-party data center supplier presented for CoreWeave's ability to meet customer demand for its services; (iii) the foregoing was reasonably likely to have a material negative impact on the Company's revenue; (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Continues to Emerge

66.    On November 10, 2025, CoreWeave issued a press release reporting its financial results for the quarter ended September 30, 2025. On the same day, CoreWeave held its Q3 2025 Earnings Call. During the call, Defendants announced lowered guidance for revenue, operating income, capital spending, and active power capacity for the year 2025.

67.    During the Q3 2025 Earnings Call, Defendant Intrator explained that the Company's expectations were "affected by temporary delays related to a third-party data center developer":

> While we are experiencing relentless demand for our platform, data center developers across the industry are also enduring unprecedented pressure across supply chains. ***In our case, we are affected by temporary delays related to a third-party data center developer who is***

21

*behind schedule. This impacts fourth quarter expectations*, which Nitin will discuss shortly.

Having said that, the customer affected by the current delays has agreed to adjust the delivery schedule and extend the expiration date. As a result, we maintain the total value of the original contract and the customer preserves their capacity for the full duration of the initial agreement, demonstrating the confidence they have in our ability to provide the most performant solutions in market.

68.    Also during the Q3 2025 Earnings Call, Defendant Agrawal provided greater detail concerning CoreWeave's newly-reduced revenue guidance for the 2025 fiscal year:

As mentioned, *the delays in powered-shell delivery associated with the data center provider will have an impact on our fourth quarter results. These delays are temporary, and as Mike noted, the affected customer has agreed to adjust the delivery schedule to preserve their capacity for the full duration and the total value of the original agreement.*

*With that backdrop, we now expect 2025 revenue in the range of $5.05 billion to $5.15 billion. In addition, we anticipate 2025 adjusted operating income between $690 million to $720 million* . . . .

69.    During the question and answer portion of the Q3 2025 Earnings Call, Defendant Intrator stated that the delays referenced above only implicated "*one data center*", in contrast to his earlier statements:

*There was a problem at one data center that's impacting us*. But there are 32 data centers in our portfolio, all of them are progressing to one extent or another. And so that is -- each one of those is independent. . . . *This one data center will catch up and then we will move forward from there*.

70.     Shortly thereafter, Defendant Agrawal restated that the delays implicated a "single provider—data center provider".

71.     On this news, CoreWeave's stock price fell $17.22 per share, or 16.31%, to close at $88.30 per share on November 11, 2025.

72.     Also on November 11, 2025, Defendant Intrator appeared for the CNBC Interview.  CNBC published the interview in an article entitled "CoreWeave CEO Won't Say if Core Scientific Caused Data Center Delays, Both Stocks Plunge."

73.     During the CNBC Interview, Defendant Intrator initially disputed Cramer's characterization that CoreWeave had suffered a "bad quarter" and continued to downplay the scope of the delays that caused CoreWeave to revise down its revenue guidance.  As to CoreWeave's performance during the quarter, among other representations, Defendant Intrator stated:

> I am proud all the things we accomplished this quarter.  ***I am proud of the infrastructure that we brought online***.  I am proud of the incredible progress we've made within our software.  I am proud that we were once again identified as the singular best solution to deliver artificial intelligence to consumers.  ***I am proud of our backlog build***.

74.     Defendant Intrator continued, repeating his misleading characterization of the scope of the data center provider's delays:  "Quite frankly, every single part of this quarter went exactly as we planned, except for one delay at a singular ***data center***" before revising his statement to "a singular data center ***provider***," as Cramer interrupted Defendant Intrator to state that his first statement was "not true."

75.    Later during the interview, Defendant Intrator again attempted to minimize the severity of the unnamed data center provider's delay:

> *You're going to see the infrastructure that was scheduled to be brought on in Q4 coming online in Q1, almost entirely, there'll be some that kind of comes on in Q2.*  You know, you're building massive scale infrastructure.  It's very physical, it's very large, it requires coordination across all of the trades, physical construction, and *there is a delay that hit, this delay will clear itself and the infrastructure will be brought online*.

76.    After Cramer asked Defendant Intrator whether CoreWeave was "losing any customers" due to its data center delays, Defendant Intrator again repeated that the delay would amount to one quarter:

> No, absolutely not. We're not losing any customers. What's really important is all of the contracts that reside within those data centers are being shifted out by the clients of ours.  *So, there's no revenue lost. The only impact on us is a delay of a quarter that you're going to see clear itself shortly*.

77.    The statements referenced in ¶¶ 67–69, 73–76 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants had overstated CoreWeave's ability to meet customer demand for its service; (ii) Defendants materially understated the scope and severity of the risk that CoreWeave's reliance on a single third-party data center supplier presented for CoreWeave's ability to meet customer

24

demand for its services; (iii) the foregoing was reasonably likely to have a material negative impact on the Company's revenue; (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

78.    After market hours on December 15, 2025, the *Wall Street Journal* published an article entitled "CoreWeave's Staggering Fall From Market Grace Highlights AI Bubble Fears," which provided several new details concerning the data center provider delays that Defendants claimed caused CoreWeave's lowered revenue guidance.  Citing "people familiar with the matter," this article stated that "heavy rains and winds caused a roughly 60-day delay at a construction site in Denton, a small city north of Dallas, preventing contractors from pouring concrete for a major AI data-center complex . . . ."  The article stated further that CoreWeave plans to lease the "huge data-center cluster" to OpenAI once it is completed, and that "***the completion date***" for the site "***has been pushed back several months***."  The article also revealed that Core Scientific is building this Denton, Texas site for CoreWeave, and that Core Scientific "***flagged weather-related delays in August***", months before Defendants announced a downward revision of revenue guidance.

79.    The WSJ Article also revealed that some data center delays were not simply weather related, as "***[t]here were additional delays caused by revisions to design plans for some of the data centers a partner is building for CoreWeave in Texas and elsewhere, according to filings***."  Again, the article revealed that Core

Scientific had warned CoreWeave months before the company announced revised revenue guidance, stating "*Core Scientific has been flagging delays to its collaborations with CoreWeave since at least February, when it reported that it had pushed back certain construction timelines in order to make design enhancements to further optimize GPU performance*."

80.    On this news, CoreWeave's stock price fell $2.85 per share, or 3.39%, to close at $69.50 per share on December 16, 2025.

81.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

82.    Defendants had both the motive and opportunity to commit fraud on investors in CoreWeave's securities during the Class Period. *During the Class Period, the Individual Defendants together sold over 6.6 million shares of company stock for over $637 million in proceeds*.  They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  Defendants were aware of, and acknowledged, challenges with getting enough infrastructure online to provide its contracted services and recognize associated revenue *beginning six months before Defendants raised revenue guidance during the Q2 2025 Earnings Call and nine*

*months before they finally lowered revenue guidance during the Q3 2025 Earnings Call*, as referenced in ¶¶ 19, 53, 55, 57, 78–79 *supra*.

83.    Accordingly, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

84.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired CoreWeave securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

85.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, CoreWeave securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from

27

records maintained by CoreWeave or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

86.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

87.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

88.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of CoreWeave;

- whether the Individual Defendants caused CoreWeave to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of CoreWeave securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

89.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

90.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- CoreWeave securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold CoreWeave securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

91.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

92.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

93.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

94.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

95.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a

fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of CoreWeave securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire CoreWeave securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

96.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for CoreWeave securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about CoreWeave's finances and business prospects.

97.    By virtue of their positions at CoreWeave, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

98.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of CoreWeave, the Individual Defendants had knowledge of the details of CoreWeave's internal affairs.

99.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of CoreWeave.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to CoreWeave's businesses, operations, future

financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of CoreWeave securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning CoreWeave's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired CoreWeave securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

100.   During the Class Period, CoreWeave securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of CoreWeave securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of CoreWeave securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The

market price of CoreWeave securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

101.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

102.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

103.   Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

104.   During the Class Period, the Individual Defendants participated in the operation and management of CoreWeave, and conducted and participated, directly and indirectly, in the conduct of CoreWeave's business affairs.  Because of their senior positions, they knew the adverse non-public information about CoreWeave's misstatement of income and expenses and false financial statements.

105. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to CoreWeave's financial condition and results of operations, and to correct promptly any public statements issued by CoreWeave which had become materially false or misleading.

106. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which CoreWeave disseminated in the marketplace during the Class Period concerning CoreWeave's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause CoreWeave to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of CoreWeave within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of CoreWeave securities.

107. Each of the Individual Defendants, therefore, acted as a controlling person of CoreWeave. By reason of their senior management positions and/or being directors of CoreWeave, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, CoreWeave to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised

control over the general operations of CoreWeave and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

108.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by CoreWeave.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.   Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: January 12, 2026                   Respectfully submitted,

                                          POMERANTZ LLP

                                          */s/ Brian Calandra*
                                          Brian Calandra
                                          Jeremy A. Lieberman
                                          (*pro hac vice* application forthcoming)
                                          J. Alexander Hood II
                                          (*pro hac vice* application forthcoming)
                                          600 Third Avenue, 20th Floor
                                          New York, New York 10016
                                          Telephone: (212) 661-1100
                                          Facsimile: (917) 463-1044
                                          bcalandra@pomlaw.com
                                          jalieberman@pomlaw.com
                                          ahood@pomlaw.com

                                          *Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## <u>TO FEDERAL SECURITIES LAWS</u>

1.      I, Raymond Masaitis, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against CoreWeave, Inc. ("CoreWeave") and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire CoreWeave securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired CoreWeave securities during the Class Period as specified in the Complaint, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of my transactions in CoreWeave securities during the Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the Class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.      I declare under penalty of perjury under the laws of the United States of America

Docusign Envelope ID: 5A73422A-7E61-42C6-AE75-F0EE38119C42

that the foregoing is true and correct.

**Executed**  <u>December 2, 2025</u>
**(Date)**



**(Signature)**

<u>**Raymond Masaitis**</u>
**(Type or Print Name)**

**CoreWeave, Inc. (CRWV)**                                              **Raymond Masaitis**

### List of Purchases/Acquisitions and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase/Acquisition | 9/4/2025 | 600 | $88.9889 |
| Purchase/Acquisition | 9/26/2025 | 300 | $120.8300 |
| Purchase/Acquisition | 10/3/2025 | 950 | $134.9300 |
| Purchase/Acquisition | 10/3/2025 | 150 | $133.2200 |
| Purchase/Acquisition | 10/7/2025 | 200 | $131.9750 |
| Purchase/Acquisition | 10/17/2025 | 1,400 | $134.9198 |
| Purchase/Acquisition | 10/20/2025 | 100 | $128.3597 |
| Sale | 9/30/2025 | (900) | $141.5370 |
| Sale | 10/16/2025 | (1,300) | $142.8301 |